---

(90 App. Div. 324.)

### In re WILKIN.

### In re CUNNINGHAM'S ESTATE.

(Supreme Court, Appellate Division, Fourth Department. January 5, 1904.)

1. TRUSTS—POWERS—TRUSTEES—EXERCISE—VALIDITY—STATUTES—AMENDMENT.
Code Civ. Proc. § 2818, as amended by Laws 1903, p. 732, c. 370, providing that where one of two trustees renounces a successor shall not be appointed unless necessary to comply with the express terms of the will, etc., but that the remaining trustee may proceed to execute the trust as if the trustee had not renounced, did not validate the exercise of a power prior to the amendment, delegated to two trustees, by one of them after the other had renounced.

2. SAME—JOINT ACTION.
Where a will empowered two trustees jointly, in their discretion, to terminate a trust for testator's son, and pay over to him the principal of

the trust fund, one of the trustees was not authorized to exercise such power alone, on the other trustee renouncing his office.

3. SAME—EVIDENCE.

Where testator created a spendthrift trust for the benefit of his son, remainder to the son's wife and children, and authorized the trustees in their discretion to terminate the trust and pay over the principal to the son, and it appeared that at the time such power was exercised by the sole remaining trustee, the son's intemperate and spendthrift habits had not improved, and that the trustee was ill-disposed towards the son's wife, and that certain of the moneys had been used to pay debts of the son to the trustee and others on which she was liable as surety, a finding of the surrogate sustaining the trustee's act as a proper exercise of discretion was erroneous.

Spring and Hiscock, JJ., dissenting.

Appeal from Surrogate's Court, Monroe County.

Judicial accounting by Anna M. C. Wilkin, as sole surviving executrix and trustee of the estate of James Cunningham, deceased. From a decree allowing the amount, the wife and children of Charles E. Cunningham appeal. Reversed.

Argued before McLENNAN, P. J., and SPRING, WILLIAMS, HISCOCK, and STOVER, JJ.

James M. E. O'Grady and John Desmond, for appellants.

Foote, Perkins & Havens, Herbert Leary, and Eugene Van Voorhis, for respondents.

WILLIAMS, J. The decree should be reversed, with costs to appellants, payable out of the income of the fund, and the matter remitted to the Surrogate's Court for such further proceedings as may be proper.

The trust in question was created under the will of the deceased. The clauses relating to the trust are, viz.:

"Ninth. I give and bequeath unto the executor of this my last will and testament hereafter to be nominated and appointed, the sum of $146,000, in trust, however, to be by him invested, and to be paid together with the increase thereof, to my son Charles E. Cunningham, or to his wife or children at such time or times, in such sums and in such manner, as such executor may deem best for the interest of said Charles E. Cunningham, and I hereby authorize him, if from any cause he deems it best so to do, at any time after ten years from my death, to give the whole of this devise and bequest, then remaining in the hands of such executor (if any part shall then remain) or any part thereof, in equal proportions to the children of said Charles E. Cunningham, then living, to whom, in that event, I give, devise and bequeath the same."

"Thirteenth. In case my son, Joseph T. Cunningham, shall at any time prior to the full completion of the trust I have imposed upon him as executor of this will, for any cause, cease to act as such executor, I hereby, in that event, nominate and appoint Anna M. Cunningham and Rufus K. Dryer to be and act as executors in his stead."

The deceased died May 15, 1886. His will was probated in June, 1886, and Joseph T. Cunningham was appointed executor. He took the trust fund and administered it while he continued as executor. In February, 1898, upon his own petition, the letters issued to him as executor and trustee were revoked. Dryer renounced his right to serve, and Anna M. (now Wilkin) was appointed executor under the thirteenth clause of the will. The principal of the trust fund of $146,000 was

transferred to the new executor. The former executor accounted and was discharged, and the new executor entered upon the performance of her duties as such. The account of the new executor, filed upon her final judicial accounting, showed that she received the principal of the trust fund and the income accrued thereon, and that she had paid the whole over to Charles E. Cunningham, the principal, viz.:

| | | |
|---|---|---|
| January 2, 1901 .................................. | $ 6,000 00 | |
| November 7, 1901 ................................ | 10,000 00 | |
| February 14, 1902 ............................... | 130,000 00 | $146,000 00 |

The proceeding for the final accounting was commenced by her February 21, 1902. The contestants are the wife and children of Charles E. Cunningham. They made no question as to the payments of the income of the fund. They objected to the payments of the principal, upon the grounds, among others, (1) that the executor had no authority to exercise the discretion given by the will to terminate the trust by the paying of the fund to Mr. Cunningham; (2) that the discretion was not properly exercised, that Mr. Cunningham was an habitual drunkard, was not competent to have the control of the fund, and the executor acted in bad faith, and paid the fund to Mr. Cunningham, with knowledge that he would waste and squander the same.

It does not appear to be contended on the part of the contestants that there was want of jurisdiction in the Surrogate's Court to determine the questions raised by them. The claim is that he erroneously decided them.

The executors, under the will, were "testamentary trustees," as defined by subdivision 6 of section 2514 of the Code of Civil Procedure. Surrogate's Courts are, by subdivision 3 of section 2472 of the Code, given jurisdiction to settle the accounts of such trustees, and it would seem that, as incidental to such settlement, that court had power to determine whether the principal of the trust fund had been properly disposed of.

1. The alleged want of authority in the executor, Mrs. Wilkin, to exercise the discretion given by the will to pay over the principal of the fund, and thus terminate the trust, is based upon the fact that the exercise of such discretion was vested in two persons, Mrs. Wilkin and Mr. Dryer, and the proposition is that both must unite in the exercise of the discretion in order to make the disposition of the principal legal. The will, by the two clauses we have quoted, created a power first in the elder son, and after he ceased to act as executor in the daughter and son-in-law, as defined by section 111 of the real property law. Chapter 547, p. 577, Laws 1896. While this law by its terms relates to real estate only, yet it is held that the Legislature intended, so far as powers were concerned, the same rules should apply to personal property. Matter of Moehring, 154 N. Y. 423–427, 48 N. E. 818, and cases therein referred to.

Those cases were decided under the Revised Statutes, but the provisions of those statutes were substantially re-enacted in the real property law. By those statutes the rules of the common law were abrogated, and new rules were established. At common law, when the execution of a power was imposed upon two or more persons, all must

join in such execution. This was one of the well-settled rules of the common law. The statutory rule is established by section 146 of the real property law, which provides that:

"When a power is vested in two or more persons all must unite in its execution; but if before its execution, one or more of such persons dies, the power may be executed by the survivor or survivors."

### And by section 154, which provides that:

"When the consent of two or more persons to the execution of a power is requisite, all must consent thereto; but if, before its execution, one or more of them dies, the consent of the survivor or survivors is sufficient, unless otherwise prescribed by the terms of the power."

Section 2818 of the Code of Civil Procedure, as it existed prior to 1903, made no provision for a case where, as here, one of two or more testamentary trustees renounced and failed to qualify. The section was amended in 1903 (Laws 1903, p. 732, c. 370) so as to provide, among other things, that where one of two or more such trustees renounces a successor shall not be appointed except where such appointment is necessary in order to comply with the express terms of the will, or unless the Surrogate's Court, or the Supreme Court, shall be of the opinion that the appointment of a successor would be for the benefit of the cestuis que trust, and unless and until a successor is appointed the remaining trustee or trustees may proceed and execute the trust as fully as if such trustee had not renounced. It is unnecessary to consider the effect of this section as amended, because it was not in force until May, 1903, long after all the principal of the fund had been paid over and the trust terminated, so far as Mrs. Wilkin could terminate it. There appears to be no other statutory provision with reference to the authority of one person to execute a power imposed upon two persons where both are still living and one renounces and refuses to act. The surrogate says:

"It is manifest that the testator intended that the discretion conferred by the will should be exercised by his sole executor and son, so long as he acted, and thereafter by the joint action and agreement of the succeeding executors named."

### And he adds:

"The law of the land is a part of every instrument. The testator must be presumed to have conferred these powers with the knowledge that they could not be exercised until such executor qualified, and that it was the right of any or all of them to decline to serve. Section 2613, Code."

And he arrives at the conclusion, therefore, that Mrs. Wilkin could exercise the discretion and execute the power of disposing of this large fund of $146,000 without the concurrence of Mr. Dryer, upon the presumption that the testator intended by the provisions of his will that she might so act if Mr. Dryer renounced and refused to act. We are unable to assent to such a construction of the will, or to the presumption of such an intent. If the will is to be construed as imposing this discretion and power upon Mrs. Wilkin and Mr. Dryer jointly, then it could not be exercised or executed, Mr. Dryer being still alive, unless both united in such action. The statute is clear and explicit. The surrogate realized this, and only escaped the effect of the statute by

construing the will as permitting one of the persons to act alone when the other renounced and refused to act. In this we think he erred.

2. Even if the authority to exercise the discretion existed under the statute and the provision of the will, the payment of the principal of the fund to Mr. Cunningham, and the. attempted termination of the trust thereby, was not, under the circumstances, the exercise of a "sound" discretion. We have examined this question of fact with a good deal of care because of the importance thereof to the wife and children of Mr. Cunningham, because the result arrived at by the surrogate seems to us to be wrong, and because he appears to have arrived at such result very reluctantly. A few passages from his opinion may well be referred to, he having heard the whole controversy and considered all the evidence. He says:

"We may think that if the testator could speak he would advise the continuance of the trust for the support of his son, with remainder to his wife and children. We may infer that the first executor, after getting the judgment of the Supreme Court that the trust was valid, and to be terminated only in the exercise of a sound discretion through one of the dispositions created by the will, wearied with demands he did not feel justified in fulfilling, resigned. We may think that the coexecutor named renounced from disinclination to pay over the entire trust fund, and we may be of the opinion that it was better and more consonant with the testator's desire that the fund remain in trust for the life use of Charles and his family, with ultimate benefit to surviving children; but neither of these views is decisive. To the discretion of the acting executor the testator committed the execution of this power of disposal. She has exercised that discretion. Unless we can find that the executor was actuated by bad faith, that she obeyed a willful purpose rather than the dictates of her judgment, we must affirm, or at least decline to reverse, her action. It is shown that bitterness and ill-feeling existed between the trustee (executor) and the wife of the principal beneficiary (Mr. Cunningham). If the fund was paid over to gratify animosity it shall not be sustained, but the evidence does not make it impossible to have been paid over in the honest discharge of duty by the trustee."

In these expressions of the surrogate in his opinion are grouped together the subjects for consideration upon this question of fact. It seems to us that the surrogate should from the evidence have arrived at a different conclusion than he did.

The judgment referred to by the surrogate has settled some things between the present parties, who were all before the court when that judgment was rendered. It will be remembered the deceased died May 15, 1886. His elder son, Joseph, served as executor until February, 1898. The action referred to was begun in December, 1896, and the judgment was entered in June, 1897. It was determined in that case that there were special reasons operating upon the mind of the testator which induced him to make the trust in question, and that the reasons which then operated upon his mind still continued, though more than eleven years had passed since the death of the testator. Can it be fairly said that such reasons had ceased to exist during the four or five years after that judgment had been rendered? Is it pretended that the habits of Mr. Cunningham had become any better, so that his ability to care for this large fund confided solely to his charge had improved in any respect, or that his treatment of his wife and children had become more tender or protective during that time? The evidence and the findings of fact by the surrogate

contained in the decision, and in the answers to the requests by the contestants, furnish only a negative answer to these questions. We need not go into details. It is certainly true that Mr. Cunningham was no better fitted to have the absolute control of this fund in 1901 and 1902 than he was when this judgment was rendered in 1897, or when the testator died in 1886. It was further determined in that case that the testator did not intend to make any special discrimination against his son Charles, but he did intend to provide for his support and maintenance and that of his wife and children, and that the trust should continue during the life of Charles, subject to its termination under the ninth clause of the will, and that the disposition of the fund should be made only in the exercise of a sound discretion. The court practically held in that action that the fund should not then be paid over; that the same reasons still continued for withholding it from Charles that existed at the time of the death of the testator, and if his wishes were to be regarded a sound discretion would not then permit such disposal of the fund. The suggestion by the surrogate as to what the testator would desire or advise if he could speak was a wise suggestion, and one that any impartial judge would concur in under the evidence. It is evident Joseph would not pay over the fund, and that Mr. Dryer would not concur with Mrs. Wilkin in doing so. Thereupon Joseph resigned, and Mr. Dryer renounced the trust and refused to serve. Mr. Cunningham was not on good terms with his wife or children, the latter being all of them in sympathy with their mother, and desiring the trust to continue and the principal of the fund to remain intact. They were all sure to suffer from a termination of the trust, and a disposition of the fund by placing it under the absolute control of their husband and father. It is perfectly apparent that it was better and more consonant with the testator's desire that the fund remain in trust for the life use of Mr. Cunningham and his family, with ultimate benefit to the surviving children. The brother Joseph, the brother-in-law Dryer, the surrogate, and finally this court all seem to concur in this judgment. All impartial persons would do the same. Under these circumstances, was the determination by the executor to pay over the fund the exercise of a sound discretion? Clearly not. Why was she determined to take such action? Was it the outgrowth of her bitter feeling of animosity towards her sister-in-law, Mrs. Cunningham? Was it in fact her desire to secure payment of moneys owing by her brother Charles to herself or for the payment of which she was liable? Some of the fund was used for such purpose. Did she act in good faith, for the best interests of all the parties interested in the trust fund, or, indeed, for the best interests of any of the parties? It seems to us not. Mr. Cunningham did not need the money for use in any business he was then engaged in or desired to engage in.. The surrogate so found. The fund, or a large part of it, was almost certain to be squandered and lost if placed in his custody. Mrs. Wilkin for some purpose, honest or dishonest, malicious or willful, or otherwise, was determined that this fund should be put beyond the reach of the wife and children, and in the absolute custody of the husband, and, therefore, disrespecting the wishes of the deceased, her

father, and the judgment of her brother Joseph and her brother-in-law Mr. Dryer, and without asking the direction of the court, which would certainly have been denied if asked for, she made haste to exercise the discretion and to pay over the money and terminate the trust.

The surrogate felt compelled reluctantly to "affirm, or at least decline to reverse, her action." The matter comes to us for our action, and we must determine the question. We cannot concur in the disposition of the matter made by the surrogate on the merits—the facts. Our conclusion is that the fund has not been properly disposed of by the executor, and must be regarded as still in her hands, to be held by her under the terms of the will, or until the court shall otherwise direct as to the disposition thereof.

Decree of Surrogate's Court reversed upon the law and the facts, with costs to the appellants payable out of the income of the fund, and matter remitted to the Surrogate's Court for such further proceedings as may be proper. All concur. SPRING and HISCOCK, JJ., on the second ground stated in the opinion only.

Form of Decision.   All Parties Appearing and Consenting Thereto.

Decree of Surrogate's court reversed upon the law and the facts, with costs to the appellants to abide event, payable from the income of the fund in controversy, and a new trial and hearing granted, upon condition, however (the parties consenting) that $140,000 of the fund be deposited to the credit of the executrix, Anna M. C. Wilkin, viz., $40,000 with the Traders' National Bank of Rochester, N. Y., $50,000 with the Rochester Trust & Safe Deposit Company, and $50,000 with the Fidelity Trust Company of Rochester, N. Y., there to remain during the pendency and until the final determination of this proceeding or the further order of this court, and the institutions above named to pay interest upon the amounts deposited with them, respectively, at the rate of 4 per cent.; the interest to be paid to the said executrix upon her drafts or checks, but the principal not to be subject to her draft or check, unless accompanied by a certified copy of an order of this court directing such payment, such order to be granted only upon notice of the application therefor to the attorneys for all the parties which shall have appeared in this proceeding, and a certified copy of the order entered upon this decision to be delivered to each depositary of the fund at the time of making the deposit; an application to change the depositaries of the fund, or of any portion thereof, to be made by the executrix whenever there shall be a reduction of the rate of interest below 4 per cent.; receipts from the several depositaries, showing compliance with the order entered upon this decision, to be filed with the clerk of this court on or before the 2d day of February, 1904; and upon the further condition (the parties consenting) that upon such new trial and hearing the parties may read from the stenographer's minutes any evidence given upon the former trial and hearing. In the event that there shall be a failure to make deposit of $140,000 of the fund, as herein provided, no new trial is granted, but the decision in that event is that there remains in the custody of the executrix, undisposed of, $140,000

of the principal of such trust fund, and that the Surrogate's Court make and enter a decree necessary to carry this decision into effect, and that the appellants have costs of the appeal, payable from the income of such part of the trust fund.